IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

GLENN D. BEAMON, )
) Case No.: 10 C 50102
Plaintiff, )
) Hon. P. Michael Mahoney
v. ) U.S. Magistrate Judge
)
MICHAEL J. ASTRUE )
Commissioner of Social Security. )
)
Defendant, )

**MEMORANDUM OPINION AND ORDER**

I. **Introduction**

Glenn D. Beamon seeks judicial review of the Social Security Administration Commissioner's decision to deny his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. *See* 42 U.S.C. § 405(g). This matter is before the magistrate judge pursuant to the consent of both parties, filed on July 8, 2010. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

II. **Administrative Proceedings**

Claimant first filed for SSI and DIB on October 13, 2006. (Tr. 127, 132.) He alleges a disability onset date of September 15, 2006. (Tr. 127.) His claim was denied initially and on reconsideration. (Tr. 53, 60.) The Administrative Law Judge ("ALJ") conducted hearings into Claimant's application for benefits on January 27, 2009. (Tr. 22.) At the hearing, Claimant was represented by counsel and testified. (Tr. 22.) Mr. Newman, a Vocational Expert (hereinafter

1

referred to as "VE") was also present and testified. (Tr. 23.) The ALJ issued a written decision denying Claimant's application on February 19, 2009, finding that Claimant was able to perform past relevant work as a gas station attendant and a bus driver, and in the alternative, that jobs existed in the national economy in significant numbers that Claimant could perform. (Tr. 19-20.) Because the Appeals Council denied Claimant's Request for Review regarding the ALJ's decision, that decision constitutes the final decision of the Commissioner. (Tr. 1.)

### III. Background

Multiple Sclerosis ("MS") is an autoimmune disease that affects the brain and spinal cord. Multiple Sclerosis, *PubMed Health*, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001747/ (last reviewed March 5, 2012). Because MS can affect nerves in any part of the brain or spinal cord, its symptoms may manifest in many parts of the body, and often differ between individuals with the disease. *Id.* A person with MS may experience muscle symptoms, bowel and bladder symptoms, eye symptoms, sensory symptoms such as numbness, tingling, or pain, or other brain and nerve symptoms. *Id.* Fatigue is another common symptom as MS progresses, and it often becomes worse in the afternoon. *Id.*

The Claimant has been diagnosed with progressive-relapsing MS. This type of MS is the least common and is characterized by "a steady progression in disability with acute attacks that may or may not be followed by some recovery." Multiple Sclerosis Health Center, *WebMD*, http://www.webmd.com/multiple-sclerosis/guide/how-disease-progresses (last reviewed March 5, 2012). The outcome of MS is hard to predict, but it is chronic and incurable. Some medications may slow the progression of MS, and certain lifestyle changes such as good nutrition, planned exercise, assistive devices, and avoidance of fatigue, stress, or illness can be

helpful for people with MS.  Multiple Sclerosis, *PubMed Health*, http://www.ncbi.nlm.nih.gov/pubmedhealth /PMH0001747/ (last reviewed March 5, 2012).

Claimant, who was 44 years old at the time of his hearing with the ALJ, was diagnosed with MS in 1996.  (Tr. 127, 247.)  He completed school through the tenth grade and later obtained a GED.  (Tr. 28.)  He previously worked as a delivery driver, cashier, satellite dish installer, school bus driver, warehouse worker, gas station attendant, and carwash service technician.  (Tr. 28-29, 162-69.)

At the hearing, Claimant testified that he lived by himself in an apartment.  (Tr. 27.)  He was not working due to the symptoms of his multiple sclerosis, and had no source of income other than a Link card for food.  (Tr. 27.)

Claimant described his previous work as a worker in the lawn and garden section of a retail store; a delivery driver for a retail store, transportation companies, and UPS; a gas station attendant; and a car wash service technician.  (Tr. 28-29.)  He was unable to return to any of the jobs because he would get fatigued, stumble a lot, and developed numbness in his hands.  (Tr. 29.)  Claimant described how a job that would allow him to sit or be stationary would present a problem because of his weak bladder.  (Tr. 29.)

Claimant described his symptoms as varying by the day.  (Tr. 30.)  They had improved "a little" since he began taking Copaxone in 2007.  (Tr. 30.)  In warm weather, he is able to walk some without a cane, but uses a prescribed cane in cold weather because his leg gets stiff.  (Tr. 30-31, 38.)  His right leg drags on the ground when he walks and he has trouble controlling it like he wants to.  (Tr. 37.)  He has difficulty walking on uneven surfaces and said that his equilibrium felt like it was off.  (Tr. 36.)  At the hearing Claimant was experiencing stiffness and

3

pain in his right leg, and joint pain in his fingers. (Tr. 32-33.) Claimant also talked about problems with his vision. (Tr. 37.) Bright or fluorescent lights bother him and start to make things look blurry. (Tr. 38.) He had not experienced a flare-up since September 2006. (Tr. 38.) During flare-ups, Claimant's whole body feels tingly and numb and his vision gets worse, though he still experiences some symptoms when not having a flare-up. (Tr. 38-39.)

On a typical day, Claimant watches television or listens to music and sleeps a lot. (Tr. 34.) He does his own cooking, cleaning, dishes, laundry, and grocery shopping. (Tr. 34-35.) He is able to bathe and dress himself, but has trouble with buttons or tying shoelaces. (Tr. 34, 40.) He tries to walk, including to a nearby store that results in a three block walk, but has trouble doing so in the cold. (Tr. 35.) He is able to read with a magnifying glass, and is supposed to get glasses. (Tr. 35.) He attends church twice a month, but does not go out to eat, go to the movies, leave town, or visit family other than on Christmas. (Tr. 35.) He served as an election judge for one day in 2008, which involved a lot of sitting and showing people how to feed ballots into the machine. (Tr. 36.)

The VE described Claimant's past work as a delivery driver, sales associate, furniture delivery driver, satellite dish installer, and the car wash tech job as primarily semi-skilled or unskilled and medium to heavy exertion. (Tr. 41-42.) The job as a bus driver was typically semi-skilled and medium, but the VE believed it was more accurate to say it was semi-skilled and light because it involved mostly seated work. (Tr. 42.) The gas station attendant job was also described as unskilled and light. (Tr. 42.)

The VE testified that a hypothetical individual of Plaintiff's age and work experience with the ability to sit for six to eight hours; stand and walk each for six hours; frequently lift and

4

carry up to ten pounds; occasionally lift and carry up to twenty pounds; occasionally stoop, crawl, climb, crouch, kneel, and balance; and must avoid concentrated exposure to unprotected heights, moving and hazardous machinery, and extreme heat could perform Plaintiff's past relevant work as a gas station attendant, which was unskilled and light, and a bus driver, which was semi-skilled and light as Plaintiff performed it. (Tr. 42-43.) The VE opined that the same hypothetical person could also perform the unskilled light jobs of hand packager, cleaner, cafeteria attendant, and cashier. (Tr. 43.) The ALJ presented a second hypothetical for a person limited to sedentary work who could stand and walk for no more than two hours per day, and could lift and carry only ten pounds. (Tr. 43.) The VE testified that such a person could not perform any of Claimant's past work, but could perform the jobs of bench hand assembler, sorter, and general assembler. (Tr. 43-44.) The VE stated that there were more than 65,000 such jobs in the Chicago area, and more than 100,000 in the State of Illinois. (Tr. 43-44.)

## IV.   Medical Evidence

Claimant's medical record begins with an emergency room visit to Stroger Memorial Hospital on September 1, 2006, where he complained of right hand parasthesia[1], right chest numbness, left chest tingling, right orbital headaches, and intermittent eye pain. (Tr. 250.) Claimant was noted to have an unsteady gait, loss of balance, a positive Romberg sign[2], and urinary urgency. (Tr. 250-51.) He reported a diagnosis of MS dating back 11 years. (Tr. 250.)

---

[1] Paresthesia refers to a burning or prickling sensation that is usually felt in the hands, arms, legs, or feet. See: National Institute of Neurological Disorders and Stroke, www.ninds.nih.gov/disorders/parethesia/paresthesia.htm (last reviewed March 1, 2012).

[2] A positive Romberg Sign is indicated if, when a subject stands with feet approximated with eyes opened and then closed, closing the eyes increases the unsteadiness. *Stedman's Medical Dictionary* 1640 (27th ed. 2000).

He was prescribed Prednisone[3] and scheduled for a follow-up appointment with a neurologist. (Tr. 253.)

Claimant saw Dr. Brannegan, a neurologist, on September 15, 2006. (Tr. 247.) Notes indicate that he initially presented 11 years earlier with generalized numbness and decreased vision in his right eye and had been diagnosed with MS after an MRI in 1996. (Tr. 247.) Claimant was noted to have gait instability, right arm numbness, urinary urgency, facial myokymia, face twitching, and dragging of his right leg. (Tr. 247.) It appears Claimant was advised to undergo an MRI, which took place on October 12, 2006. (Tr. 247, 254.) The MRI revealed findings consistent with MS. (Tr. 254.) Claimant returned to see Dr. Brannegan on December 26, 2006, and was found to have problems with dragging his right leg and visual abnormalities. (Tr. 246.) He was diagnosed as having relapsing progressive MS and Dr. Brannegan made a notation about talking to a social worker regarding disability. (Tr. 246.)

On November 28, 2006, Dr. Virgilio Pilapil, M.D., a state agency reviewing physician, completed a physical residual functional capacity ("RFC") assessment. (Tr. 245.) Dr. Pilapil found the following exertional limitations: occasionally lifting or carrying ten pounds; frequently lifting or carrying less than ten pounds; standing or walking for a total of at least two hours; sitting for a total of about six hours; and unlimited pushing or pulling. (Tr. 239.) Dr. Pilapil also indicated that Plaintiff could occasionally perform the following postural limitations: climbing ramps, stairs, ladders, ropes, and scaffolds; balancing; stooping; kneeling; crouching; and crawling. (Tr. 240.) Dr. Pilapil did not find any manipulative, communicative, or visual

---

[3]Prednisone is a corticosteroid that is used to treat a number of conditions, including MS. Prednisone, *PubMed Health*, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000091/ (last reviewed March 1, 2012).

limitations, but noted that Plaintiff had occasional near and far acuity with the left eye. (Tr. 241-42.) Dr. Pilapil also found that Plaintiff should avoid concentrated exposure to extreme heat and hazards such as machinery or heights. (Tr. 242.) State agency reviewing physician Reynaldo Gotanco, M.D. affirmed these
findings on January 25, 2007. (Tr. 260-62.)

Dean Velis, M.D., F.A.C.P., performed a consultative internal medicine examination on a referral from the state agency on January 16, 2007. (Tr. 256.) Claimant was cooperative and had a serious, polite, and sincere demeanor. (Tr. 257.) Claimant was found to have a conscious gait and he was using a cane. (Tr. 258.) His finger grasp was 5/5 and his hand grip and ability to manipulate was unimpaired bilaterally. (Tr. 258.) Dr. Velis noted that Claimant complained of fatigue, malaise, paraesthesias, visual disturbances, photophobia, and abnormal motor coordination along with an abnormal gait. (Tr. 258-59.) The clinical impression of Dr. Velis was that Claimant had MS for over ten years with the constitutional symptoms. (Tr. 258.)

On March 20, 2007, Claimant saw Dr. Brannegan and was noted to have numbness in both hands, difficulty with vision in brightly lit areas, and muscle tightness in his right thigh. (Tr. 267.) Claimant reported that his balance had improved and that he no longer required a cane to walk. (Tr. 267.) Claimant stated that he had started taking Copaxone six weeks prior to the appointment, and that he thought it was helping. (Tr. 267.) He had not had a flare up since September 2006. (Tr. 267.) Claimant continued to have gait and balance problems, and he circumducted his right leg. (Tr. 267.) Claimant was found to have similar symptoms and improvement at a July 17, 2007 appointment with Dr. Brannegan. (Tr. 266.) Dr. Brannegan noted that Claimant felt he was a little stronger and more steady in recent months, though he still

7

walked slowly and with a cane. (Tr. 270.) Claimant was found to have progressing / relapsing MS and continued on Copaxone. (Tr. 266.)

Claimant next saw Dr. Brannegan on March 18, 2008. (Tr. 265.) Claimant reported tightness in his right leg, continued decreased vision with his right eye better than his left, and continued numbness and tingling in both hands. (Tr. 265.) Claimant stated that his balance is off with walking long distances but is improved. (Tr. 265.) The attending physician indicated that Claimant's MS manifests itself primarily as a gait and balance disturbance and visual impairment. (Tr. 265.) Dr. Brannegan continued to prescribe Copaxone and suggested that Claimant follow-up in six months. (Tr. 265.)

Dr. Brannegan also filled out an MS residual functional capacity questionnaire on March 18, 2008. (Tr. 86-89.) Dr. Brannegan identified the following symptoms in regard to Claimant: fatigue, balance problems, poor coordination, weakness, unstable walking, numbness, tingling or other, sensory disturbance, bladder problems, and double or blurred vision/partial or complete blindness. (Tr. 86.) Dr. Brannegan indicated that Claimant had significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movement or gait and station. (Tr. 86.) He noted that Claimant walks cautiously with circumduction of his right leg, and would experience fatigue with walking after one-half mile. (Tr. 86-87.) The MS RFC says that emotional factors contribute to the severity of Claimant's symptoms and functional limitations. (Tr. 87.) Dr. Brannegan found that Claimant's experience of pain, fatigue, or other symptoms was frequently severe enough to interfere with attention and concentration. (Tr. 87.) Dr. Brannegan also found that Claimant would not be capable of even low stress jobs because he could not see adequately, and that Claimant's

8

symptoms could be expected to last at least twelve months. (Tr. 87.) Dr. Brannegan opined that Claimant had the following limitations: sitting for two hours at a time; standing for thirty minutes at a time; sitting for about four hours total; standing less than two hours total; shifting at will from sitting, standing, or walking; taking unscheduled ten-minute breaks every hour; significant limitations in doing repetitive reaching, handling, or fingering; avoiding concentrated exposure to extreme cold, fumes, odors, dusts, gases, poor ventilation, and hazards; and avoiding all exposure to extreme heat and humidity. (Tr. 88-90.)

On September 2, 2008 Claimant reported to a medical student at Dr. Brannegan's office that he continued to have tightness in his right leg, though it did not bother him as much. (R.272.) He reported continuing vision problems and increased amounts of light bothered him (R.272.) The numbness in his hand was better, but he felt more numbness on his right side and had some decreased sensation of the left upper division. (Tr. 272.) Claimant was also found to have decreased pinprick sensation in his right upper extremity. (Tr. 272.)

Claimant saw Vinod Wadhwa, M.D., on December 18, 2008.[4] (Tr. 274.) Claimant reported that his vision was blurred and that he needed a magnifying glass to read. (Tr. 274.) Dr. Wadhwa diagnosed Claimant with optic atrophy following MS, and prescribed him new glasses. (Tr. 274.)

## V.   Standard of Review

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). The ALJ's legal

---

[4] The court notes that the record of this visit was not before the ALJ. It was included in the record prior to the case being reviewed by the Appeals Council.

conclusions are reviewed de novo.  *Binion v. Charter,* 108 F.3d 780, 782 (7th Cir. 1997).

However, the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]."  *Id*.  The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case are entrusted to the Commissioner.  *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner.").  The court may remand to the Commissioner where there is a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.  42 U.S.C. § 405(g).

If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm.  42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion."  *Binion*, 108 F.3d at 782.  If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence.  *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).  However, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded."  *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

**VI.     Framework for Decision**

"Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether any other work exists in significant numbers in the national economy which accommodates the claimant's residual functional capacity and vocational factors. The court will analyze each of these factors to determine whether the Commissioner's decision was supported by substantial evidence.

## VII. Analysis

### A. Step One: Is the Claimant Currently Engaged in Substantial Gainful Activity?

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or

11

work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

In this case, the ALJ found that Claimant has not engaged in substantial gainful activity since the alleged onset date. (Tr. 14.) Neither party disputes this determination. As such, the ALJ's Step One determination is affirmed.

### B. Step Two: Does the Claimant Suffer From a Severe Impairment?

Step Two requires a determination whether the claimant is suffering from a severe impairment. A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers a severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

In performing the Step Two analysis in this case, the ALJ found that Claimant has the following severe impairments: multiple sclerosis and obesity. (Tr. 14.) The substantial evidence in the record supports the conclusion that Claimant had one or more severe impairments, and the parties do not dispute this determination. Therefore, the ALJ's Step Two determination is affirmed.

### C. Step Three: Does Claimant's Impairment Meet or Medically Equal an Impairment in the Commissioner's Listing of Impairments?

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app. 1. The listings describe, for each of the body's major systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. § 404.1525(a). The listings streamline the decision process by identifying

certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to a listed impairment, then the claimant is found to be disabled and the inquiry ends; if not, the inquiry moves on to Step Four.

In performing the Step Three analysis in this case, the ALJ determined that Claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, appx. 1. (Tr. 14.) The ALJ found that Claimant's MS did not satisfy the criteria listed under section 11.09 because it has not resulted in significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements or gait and station, or in significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination. (Tr. 15.) The parties do not appear to challenge the ALJ's findings at Step Three, so the court will affirm the ALJ's determination.

**D.    Step Four: Is the Claimant Capable of Performing Work Which the Claimant Performed in the Past?**

At Step Four, the Commissioner determines whether the claimant's residual functional capacity ("RFC") allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his or her impairment. 20 C.F.R. § 404.1545(a). The RFC assessment is based upon all of the relevant evidence, including objective medical evidence, treatment, physicians' opinions and observations, and the claimant's own statements about his limitations. *Id*. Although medical opinions bear strongly upon the determination of RFC, they are not conclusive; the determination is left to the

13

Commissioner who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *see Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

When assessing the credibility of a claimant's statements about his or her symptoms, including pain, the ALJ should consider the following in addition to the objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. Social Security Ruling 96-7p; *see* 20 C.F.R. § 404.1529(c).

Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565(a); Soc. Sec. Rul. 82-62. If the claimant's RFC allows him to return to past relevant work, the claimant will not be found disabled; if the claimant is not able to return to past relevant work, the inquiry proceeds to Step Five.

In performing the Step Four analysis, the ALJ determined Claimant's RFC to be the following:

> the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), except he is limited to: occasionally stooping, crawling, climbing, crouching, kneeling, and balancing; and he must avoid concentrated exposure to

14

>     unprotected heights, moving and hazardous machinery, and extreme
>     heat. (Tr. 15.)

In making her RFC determination, the ALJ indicated that she considered all of Claimant's symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the medical evidence and other evidence. (Tr. 15.) The ALJ also considered opinion evidence in accordance with the requirements of 20 CFR 404.1529 and 20 CFR 416.927 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p. (Tr. 15.) The ALJ found that Claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms. (Tr. 18.) The ALJ then had to consider the intensity, persistence, and limiting effects of Claimant's symptoms to determine the extent to which they limit Claimant's ability to do basic work activities. Where statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by medical evidence, a finding is made on the credibility of the statements based on a consideration of the entire record. The ALJ found Claimant's statements concerning intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the assessed RFC. (Tr. 18.)

Based on her RFC finding, the ALJ found that Claimant was capable of performing his past relevant work as a gas station attendant and a bus driver. (Tr. 19.) Claimant argues that the ALJ improperly rejected the opinions of Claimant's treating physician, failed to consult a medical expert or re-contact the treating physician, and ultimately arrived at an unsupported RFC finding. (Pl. Mem., Dkt. No. 17-1, pp. 9-15.)

The ALJ did, in fact, assign "little weight" to the opinion of Claimant's treating physician, Dr. Brannegan. (Tr. 19.) Generally, an ALJ will give more weight to the opinion of treating sources because of the likelihood that they are most able to provide a "detailed,

longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings" or from consultative examinations. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and is not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). However, controlling weight may not be given to a treating source's medical opinion unless it is "not inconsistent" with the other substantial evidence in the record. SSR 96-2p. In all circumstances, the ALJ should give good reasons for the weight assigned to a treating physician. 20 C.F.R. § 404.1527(d)(2).

When an ALJ does not give controlling weight to the opinion of a treating physician, she should apply the following factors to determine how much weight to give the opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the treater; and (5) any other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). The ALJ emphasized that Dr. Brannegan's opinion was not supported by clinical or laboratory abnormalities "one would expect if the claimant were, in fact, disabled." (Tr. 19.) The ALJ also stated that the treatment pursued by Dr. Brannegan was not consistent with "what one would expect" if the Claimant were truly disabled. (Tr. 19.) Ultimately the ALJ found Dr. Brannegan's RFC conclusions to be "excessively restrictive" and "in direct contradiction of his own treatment notes." (Tr. 19.) In support of these statements, the ALJ cites to Claimant's lack of an exacerbation since September 2006, steady improvement since that time, lack of a need for

steroid treatments or fatigue medications, and lack of emergency room visits or hospitalizations since 2006. (Tr. 18.)

It is unclear what clinical findings and treatment administered by Dr. Brannegan were inconsistent with his opinions about Claimant's capabilities. Dr. Brannegan is a specialized doctor (neurologist) who treated Claimant on a consistent basis for nearly two years. Dr. Brannegan always diagnosed Claimant with progressing relapsing MS. Claimant's symptoms were consistently recorded, and included hand numbness, balance problems, vision problems in his right eye, right thigh tightness, right leg circumduction, and fatigue. The results of a 2006 MRI were consistent with progressing MS. The court finds no support for the ALJ's conclusion that Dr. Brannegan's opinion about Claimant's RFC was in direct contradiction of his own treatment notes. The ALJ appears to have selected certain aspects of Claimant's medical history, including the lack of hospitalizations and certain prescribed medications, and substituted her own medical judgment for that of Claimant's treating physician. *See Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) (an ALJ should not play the role of doctor, and "cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion").

The ALJ also found that Claimant's statements concerning intensity, persistence, and the limiting effects of his symptoms are not credible to the extent that are inconsistent with the RFC. (Tr. 18.) The ALJ relied on treatment notes showing Claimant's lack of hospitalization, lack of flare-ups, and lack of steroid-based or fatigue medications. (Tr. 18.) The ALJ noted that Claimant's record did not reflect complaints of fatigue, and that his use of a cane at the hearing was inconsistent with a report in the record that Claimant no longer needed a cane. (Tr. 18-19.) Regarding Claimant's visual limitation, the ALJ found that Claimant's reading and television

17

watching suggested that his vision impairment was not as debilitating as has been alleged. (Tr. 19.) Finally, the ALJ considered the fact that Claimant worked one whole day without sleeping when he served as an election judge. (Tr. 19.)

The ALJ's position regarding Claimant's testimony lacks evidentiary support. Dr. Velis, a consultative medical examiner, indicated that Claimant complained of fatigue in January 2007, as did Dr. Brannegan in February 2008. (Tr. 256, 258.) Claimant's other statements, when viewed in their complete context, do not support the ALJ's position. Claimant testified that he reads, but has to use a magnifying glass. He explained that he did not always need a cane, but that his symptoms varied by the day and he needed his prescribed cane in cold weather. (Tr. 38.) While working as an election judge, Claimant was able to sit for most of the day. (Tr. 36.) The court finds that the ALJ's analysis regarding Claimant's credibility cherry-picked from Claimant's statements and attempted to find inconsistencies in the record that do not appear to be based on medical evidence.

The court also notes that the ALJ opinion is incorrect in stating Claimant was diagnosed with "relapsing and remitting" MS on December 26, 2006 (Tr. 17.). In fact he was diagnosed with relapsing progressive MS. (Tr. 246.) This error is both substantive and significant.

After minimizing the treating physician's opinions and Claimant's testimony, the ALJ afforded some weight to the non-examining physicians. The RFC form filled out by Dr. Pilapil indicated that Claimant was capable of occasionally lifting or carrying ten pounds; frequently lifting or carrying less than ten pounds; standing or walking for a total of at least two hours; sitting for a total of about six hours; and unlimited pushing or pulling. (Tr. 239.) Dr. Pilapil also noted that Claimant could occasionally climb ramps, stairs, ladders, ropes, and scaffolds;

18

balance; stoop; kneel; crouch; and crawl. (Tr. 240.)

The ALJ concluded that Claimant was capable of light work, with the additional limitations noted by Dr. Pilapil. Light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds. 20 C.F.R. 404.1567(b). Clearly, the ALJ's RFC conflicts with Dr. Brannegan's RFC, and even with Dr. Pilapil's RFC. The court finds that the ALJ failed to create a logical bridge from the evidence in the record to her RFC findings. Because the ALJ incorporated her flawed RFC findings in the hypothetical posed to the VE, the VE's testimony is not reliable. The court notes, however, that the VE's testimony that Claimant could return to his work as a bus driver is questionable in light of the medical evidence indicating Claimant's vision problems, difficulties controlling his leg, and numbness or tingling in his limbs.

For the foregoing reasons, the ALJ's Step Four finding is reversed and remanded. On remand, the Commissioner must re-examine the Claimant's RFC and make a new Step Four determination.

**E.      Step Five: Does Any Other Work Exist in Significant Numbers in the National Economy Which Accommodates the Claimant's Residual Functional Capacity and Vocational Factors?**

The ALJ made an alternative finding that significant numbers of jobs exist in the national economy that the Claimant can perform. The ALJ's conclusion was based on the VE's testimony that a person with Claimant's age, education, work experience, and RFC, could perform the jobs of representative occupations such as: hand packer, cleaner, cafeteria attendant, and cashier. The VE's testimony was based on the ALJ's RFC finding.

19

The court incorporates its analysis at Step Four regarding the ALJ's RFC finding. Because the ALJ failed to build a logical bridge between the medical evidence and her RFC finding, it cannot be said that the ALJ's reliance on the VE's testimony was appropriate. The court finds that the ALJ's Step Five analysis was never fully developed, and therefore, lacked evidentiary support.

## VIII. Conclusion

For the forgoing reasons, Claimant's motion for summary judgment is granted, and the Commissioner's motion for summary judgment is denied. This matter is reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g) with instructions that the Commissioner conduct further administrative proceedings in accordance with this opinion.

**E N T E R:**

_____
**P. MICHAEL MAHONEY, MAGISTRATE JUDGE**
**UNITED STATES DISTRICT COURT**

**DATE**: March 13, 2012